UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN A. RIGAS, and CARRIE RIGAS, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-3770 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court are the cross-motions for summary judgment of Plaintiffs John A. Rigas and Carrie Rigas (collectively, the "Rigases") and Defendant United States of America (the "Government"), and Plaintiffs' Motion to Shift the Burden of Proof. Upon considering the Motions, all responses thereto, arguments of counsel, and the applicable law, the Court finds that Plaintiffs' Motion to Shift the Burden of Proof (Doc. No. 30) must be granted, Plaintiffs' Motion for Summary Judgment (Doc. No. 38) must be denied, and Defendant's Motion for Summary Judgment (Doc. No. 32) must be granted.

## I.    BACKGROUND

This is a tax refund case brought by the Rigases against the Government. The Rigases claim they are entitled to a refund on their 2004 personal income tax return because income that was reported and taxed as ordinary income should have been reported and taxed as capital gains. The income that is the source of the dispute are proceeds from a business relationship between Odyssey Energy Capital I, LP ("Odyssey") and Hydrocarbon Capital LLC ("Hydrocarbon").

Prior to 2003, John Rigas, David Stewart, R. Kelly Plato, Harold Abels, and Robert Loving worked for Mirant Corporation ("Mirant") and managed Mirant's oil and gas

1

investments. (Stip. of Facts ¶ 2.) In March 2003, Hydrocarbon purchased from Mirant a portfolio of interests related to the oil and gas industry, including credit agreements, royalty interests, and stock warrants. (*Id.* ¶ 1.) Hydrocarbon asked the five former Mirant employees to manage the portfolio of assets due to their past management experience. (*Id.* ¶ 2.) The five men formed Odyssey to carry out the management functions. (*Id.*) Each man was a limited partner in Odyssey, while Odyssey's general partner was a limited liability corporation. (Doc. 32 Ex. 7.)

Odyssey and Hydrocarbon entered into a Loan Management and Servicing Agreement (the "Management Agreement"). (Doc. 32 Ex. 5.) Under the terms of the Management Agreement, Odyssey provided servicing, management, administration and disposition services with respect to the asset portfolio, including the hiring of necessary environmental and petroleum consultants and conducting physical inspection of the assets within the portfolio. (*Id.* Art. V.) Odyssey agreed to maintain an office, to employ adequate personnel, to collect payments on the assets, and to track overhead expenses. (*Id.*) Odyssey's overhead expenses, including salaries of the individual partners of Odyssey, were funded through a $6 million nonrecourse promissory note (the "Promissory Note") issued by Hydrocarbon to Odyssey. (Doc. No. 32 Exs. 3, 10.)  On a semiannual basis, Odyssey would submit a budget for overhead expenses to Hydrocarbon for its review and approval. Once approved, Hydrocarbon would draw down sums from the promissory note and wire the loan funds to Odyssey. (*Id.*)

Odyssey possessed the authority to take actions with respect to the assets that were in the best interest of Hydrocarbon. (*Id.* Art. VII.) However, Odyssey was subject to certain limitations on its authority, including the inability to enter into binding commitments to dispose of assets, to incur unforeseen expenses, and to enter into transactions that were not previously approved by Hydrocarbon. (*Id.*) Odyssey acknowledged that Hydrocarbon retained title, ownership, and

exclusive control of the assets and that Odyssey would not acquire title to, any security interest in, or rights of any kind in the assets. (*Id.* Art. II.) Finally, Article 18.1 of the Management Agreement provided,

> <u>No Partnership Intended</u>. Nothing in this Agreement shall be deemed or construed to create a partnership or joint venture between or among any of the parties hereto nor shall [Odyssey] be deemed to be the general partner of [Hydrocarbon]. It is specifically acknowledged and agreed that, in performing its duties and obligations hereunder, [Odyssey] is acting solely in the capacity as an independent contractor for, and an agent of, [Hydrocarbon].

Under the Management Agreement, Odyssey would be paid a performance fee (the "Performance Fee") "[a]s full compensation for rendering services." (Doc. No. 32 Ex. 5 at 33.) The Performance Fee would be paid after disposing of income realized on the asset portfolio in the following manner. First, Hydrocarbon would recoup all third-party out-of-pocket expenses. Second, Hydrocarbon would recoup the initial value of the asset portfolio. Third, Hydrocarbon would receive a preferred return of 10% of the profits. Fourth, Hydrocarbon would use the remaining funds to pay off any amounts outstanding on the Promissory Note. Fifth and finally, Odyssey and Hydrocarbon would split the profits whereby Odyssey would take 20% of the profits and Hydrocarbon would retain 80% of the profits. (*Id.* at 33-34.) Odyssey's Performance Fee was subject to a "claw-back" provision that ensured Hydrocarbon would receive the amounts provided for in steps 1-4 of this calculation. (*Id.* at 34.)

In 2004, the capital assets in the portfolio were sold for $288,000,000. (Stip. of Facts ¶ 4.) Hydrocarbon's gain on the sale was approximately $110,000,000. (*Id.*) After providing for the first four steps in the Performance Fee calculation, Odyssey received approximately $20 million as its Performance Fee. (Doc. No. 32 Ex. 1 at 1.) Odyssey later paid Hydrocarbon $31,920 under the claw-back provision of the Management Agreement. (Stip. of Facts ¶ 6.)

Odyssey filed a partnership income tax return on Form 1065 for the tax year 2004 (the "Original 2004 Odyssey Return"). (Doc. No. 32 Ex. 1.) In it, Odyssey characterized the approximately $20 million it had received from Hydrocarbon as "gross profit" income. (*Id.* at 1.) Odyssey issued Schedules K-1 to its limited partners, including John Rigas. (*Id.* at 13.) The K-1 stated that Odyssey had distributed to Rigas approximately $4 million in ordinary business income. In turn, the Rigases filed a joint individual income tax return for tax year 2004 (the "Original 2004 Rigas Return"). (Doc. No. 32 Ex. 25.) In line with the K-1, the Rigases reported the approximately $4 million they received from Odyssey as ordinary income.

In April 2007, Odyssey filed an amended partnership tax return for tax year 2004 (the "Amended 2004 Odyssey Return"). (Doc. No. 32 Ex. 2.) Odyssey used the standard Form 1065 and checked the box next to "Amended Return" to indicate that it was amending its original 2004 return. In the amended return, Odyssey changed the way it characterized the $20 million it had received from Hydrocarbon. Odyssey now characterized the $20 million as "net long-term capital gain" acquired from a sale of "Hydogen Capital." (*Id.* at 3, 6.) Odyssey also attached amended Schedules K-1 for its limited partners, including John Rigas. Rigas's amended K-1 listed the $4 million distribution to Rigas as "net long-term capital gain" rather than ordinary business income. (*Id.* at 7.) The Amended 2004 Odyssey Return was accepted and processed by the Internal Revenue Service ("IRS"). IRS records show that activity on the return occurred in September 2007, November 2007, and January 2008, but without full examination by an IRS field office. (Doc. No. 42 Exs. 1, 2, 3; Swain Aff. ¶¶ 11-14.)

Meanwhile, the Rigases also filed an amended individual tax return for tax year 2004 (the "First Amended 2004 Rigas Return"). (Doc. No. 32 Ex. 27.) The Rigases changed the characterization of the approximately $4 million received from Odyssey in 2004 from ordinary

income to capital gains. As the explanation for the changes made to the return, the Rigases stated: "Taxpayers received amended K-1S from Odyssey Energy Capital I LP and from Odyssey Energy Capital LLC after their original return was filed. This amended return reflects the amended information." (*Id.* at 2.) Based on the new characterization of the income as "capital gains," the Rigases sought a refund of approximately $800,000. (*Id.* at 1.)

In August 2007, the IRS sent the Rigases a request for more information, including a "completed Form 1040X to support the changes you have made" and a "completed copy of Part II, page 2, Form 1040X. We need to know what items of income, deductions, or credits you changed, the amount of each change, and the reasons for the changes. Attach supporting forms and/or schedules to the amended return." (Doc. No. 32 Ex. 47 at 1.) Specifically, the IRS noted that the amended K-1 did not explain the tax decrease or the increase to adjusted gross income and taxable income. (*Id.*) The Rigases' accountant responded by mailing the IRS the Original 2004 Odyssey Return, the Amended 2004 Odyssey Return, the original and amended Forms K-1, the Original 2004 Rigas Return, and the First Amended 2004 Rigas Return. (Doc. No. 32 Ex. 48.) The accountant explained in his letter that the "long-term capital gains" changed from a loss of $3,000 to a gain of $4,448,657, and that passive income and loss had changed from income of $4,222,999 to a gain of $3,394. (*Id.*)

In December 2007, the IRS disallowed the Rigases' refund claim. (Doc. No. 42 Ex. 13.) However, the IRS accepted the amended individual tax returns of two of Odyssey's other limited partners, which had been filed based on the Amended 2004 Odyssey Return, and issued refunds to them in February and May 2008. (Doc. No. 42 Ex. 5 ¶¶ 14-15.)

The Rigases subsequently filed another amended individual tax return in January 2008 (the "Second Amended 2004 Rigas Return"). (Doc. No. 32 Ex. 28.) The case was assigned to an

IRS examining officer named Michael Glass. (Doc. No. 42 Ex. 20; Ex. 11 at 18) Glass contacted the Rigases and spoke with the Rigases' accountant over the course of 2008 and early 2009 about the return. Glass understood the main issue to be whether the income received by Odyssey from Hydrocarbon should be considered capital gains or ordinary income, which, in turn, depended on the nature of the portfolio assets and Odyssey's relationship with Hydrocarbon. (*Id.* at 2.) In addition, Glass researched whether Odyssey possessed a "carried interest" in the asset portfolio. (*Id.*) The Rigases' accountant met with Bridges, provided Bridges with the agreements between Odyssey and Hydrocarbon, and provided Bridges with information regarding the assets in the portfolio. (*Id.* at 1-2.) In July 2009, Glass transferred the Rigases' case to another IRS agent named Michael Bridges. (Doc. No. 42 Ex. 11 at 15.) While the IRS considered the Rigases' refund claim, the Rigases also filed a Notice of Inconsistent Treatment or Administrative Adjustment Request ("AAR") on Form 8082. (Doc. No. 42 Ex. 21.) The IRS eventually concluded that Odyssey's 20% profits interest was compensation for services and, therefore, the income received by Rigas should be characterized as ordinary income. (Doc. No. 42 Ex. 24 at 12-13.). The IRS disallowed the Rigases' refund claim for the second time in December 2009. (Doc. No. 42 Ex. 25.)  The Form 8082 submitted by the Rigases was rejected because it had not been filed within three years after the Original 2004 Odyssey Return had been filed.

The Rigases subsequently filed suit against the Government for a tax refund pursuant to 26 U.S.C. §§ 6228(b), 7422. The Rigases have moved to shift the burden of proof to the Government and for summary judgment. The Government has moved for summary judgment. Oral argument was held on February 11, 2011. The motions have been briefed and are ripe for disposition.

## II.     MOTION TO SHIFT BURDEN OF PROOF

The Rigases have moved to shift the burden of proof to the Government on the basis of IRC § 7491 and the IRS's allegedly baseless and arbitrary decision to deny the Rigases' request for a tax refund.[1] Because we find that application of IRC § 7491 supports shifting the burden to the Government, we need not determine whether the IRS's notice of disallowance was arbitrary and baseless.

IRC § 7491 provides for a shifting of the burden of proof to the Government where the taxpayer provides "credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by" the Code. IRC § 7491(a). The burden will shift only if the taxpayer meets three requirements:

> (A) the taxpayer has complied with the requirements under this title to substantiate any item;
> (B) the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews; and
> (C) in the case of a partnership, corporation, or trust, the taxpayer is described in section 7430(c)(4)(A)(ii) [26 USCS § 7430(c)(4)(A)(ii)].

IRC §§ 7491(a)(1)(A)-(C). Subsection (C) does not apply here since the Rigases are not a partnership, corporation, or trust.

We first examine whether the Rigases have submitted credible evidence. "Credible evidence" is the "quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." *Higbee v. Comm'r*, 116 T.C. 438, 442 (T.C. 2001) (quoting H. Conf. Rept. 105-599, at 240-41 (1998), 1998-3 C.B. 747, 994-95). The issue presented here is whether the Rigases are entitled to claim as capital gains the distribution

---

[1] Previously, the Rigases also sought to shift the burden of proof on the grounds of spoliation of evidence. The Government subsequently provided the Rigases with the documentation they sought and so the Rigases withdrew their spoliation argument.

that Odyssey received from Hydrocarbon in 2004. This determination turns on whether Odyssey and Hydrocarbon were in a partnership, under federal tax law, or were simply in a servicing relationship. To support the claim for capital gains treatment, the Rigases submitted Odyssey's original and amended returns, the Rigases' original and amended returns, and the original and amended Forms K-1. To support the existence of a partnership between Odyssey and Hydrocarbon, the Rigases submitted the Management Agreement, the Promissory Note, and deposition testimony of several Odyssey partners. This evidence provides sufficient information about the Odyssey relationship in order to determine whether the relationship between Odyssey and Hydrocarbon was a partnership. Therefore, we find that the Rigases have provided credible evidence with respect to a factual issue—here, the existence of a partnership—that is relevant to ascertaining whether the Rigases are liable for ordinary income tax or capital gains tax.

We also find that the Rigases have complied with the substantiation requirements of the Code. They have retained the relevant tax returns for themselves and for Odyssey, the relevant Forms K-1, the relevant correspondence with the IRS, underlying documentation of the assets held by Hydrocarbon, and the relevant agreements between Hydrocarbon and Odyssey.

Finally, we find that the Rigases have cooperated with the IRS's requests for witnesses, information, documents, meetings and interviews. The Rigases' accountant, Jeffrey Wilkinson, spoke frequently with IRS agent Bridges about the Rigases' tax returns. Wilkinson met with Bridges at Bridges' request to discuss the amendment to the Rigases' tax return. Wilkinson provided Bridges with copies of the relevant agreements between Hydrocarbon and Odyssey and informed him of the Rigases' bases for characterizing their income from Hydrocarbon as capital gains. Though the Government argues that the Rigases' were less than forthcoming in response

to the IRS's August 2007 letter, we find that the Rigases' provided sufficient information at that time considering the cursory nature of the IRS's request.

In sum, we find that the Rigases have met their burden under § 7491 to shift the burden of proof to the Government. As a result, the Government will be required to prove by a preponderance of the evidence that the Rigases are not entitled to a tax refund. *See United States v. Janis*, 428 U.S. 433, 440 (1976) (in a conventional refund action, "the taxpayer bears the burden of proving the amount he is entitled to recover.")

## III.    SUMMARY JUDGMENT LEGAL STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).  The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Id*.  Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.  F.R.C.P. 56(e)(1); *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied

with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986)).

IV.    **ANALYSIS**

**A. Jurisdiction Under TEFRA**

The Government seeks summary judgment on the ground that the Rigases' individual amended tax return conflicts with the Odyssey tax return, which, according the Government, remains unadjusted. As a result, the Odyssey tax return still shows the income received from Hydrocarbon as ordinary income rather than capital gains. In the face of the partnership-level characterization of the income as ordinary, the Rigases cannot characterize the income on their partner-level return as anything other than ordinary.

The Rigases make several arguments that TEFRA forecloses differential treatment among the Odyssey individual partners and between Odyssey and themselves. The Rigases contend that the IRS adjusted the Performance Fee, changing its characterization from ordinary income to capital gains, when it processed the Amended 2004 Odyssey Return. As such, the Rigases believe that TEFRA prevents the IRS from doing anything other than issuing refunds to the individual partners. As an alternative, the Rigases believe that they have instituted proper proceedings in order to obtain an adjustment of the Performance Fee.

We note that, under TEFRA, our jurisdiction to hear refund claims is exceedingly narrow. We begin by describing the relevant provisions of TEFRA and then determine whether they operate to allow jurisdiction in this case.

**1.   TEFRA**

For tax purposes, partnerships are considered pass-through entities that file informational returns, but do not pay federal income tax. 26 U.S.C. § 6031. Partnerships issue Schedules K-1 to

individual partners, who report all income, gain, losses, deductions, taxes, and penalties corresponding to their share in the partnership on their personal income tax returns. *Id.* §§ 701-704.

Congress enacted the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), 26 U.S.C. §§ 6221-6233, to avoid duplicative litigation stemming from the tax treatment of partnerships. TEFRA creates a unified procedure for determining the treatment of partnership transactions by requiring that "the tax treatment of any partnership item shall be determined at the partnership level" rather than separately at the partner level. 26 U.S.C. § 6221; *see also In re Crowell*, 305 F.3d 474, 478 (6th Cir. 2002).

A partnership item is defined as "any item required to be taken into account for the partnership's taxable year under any provision of Subtitle A to the extent regulations prescribed by the Secretary provide that, for purposes of [Subtitle F], such item is more appropriately determined at the partnership level than at the partner level." 26 U.S.C. § 6231(a)(3). The regulations provide that items "more appropriately determined at the partnership level" include the gains, losses, deductions, and credits of a partnership. 26 C.F.R. § 301.6231(a)(3)-1. The term "partnership item" also "includes the accounting practices and the legal and factual determines that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction, etc." 26 C.F.R. § 301.6231(a)(3)-1(b).

TEFRA provides two ways to adjust a partnership item. First, the IRS may initiate administrative "partnership proceedings," which result in the issuance of a Final Partnership Administrative Adjustment ("FPAA"). 26 U.S.C. §§ 6223, 6225. Second, the taxpayer may request adjustment of a partnership item by filing an administrative adjustment request ("AAR"). The AAR may be filed by either an individual partner or by a partnership. 26 U.S.C. §§ 6227(a),

(c). Both an AAR filed by a partner and an AAR filed by a partnership must be submitted within three years after the partnership return for the year that is the subject of the AAR that has been filed. *Id.* § 6227(a)(1)(A).

If an individual partner files an AAR, the IRS may do one of the following: (1) process the AAR in the same manner as a claim for credit or refund with respect to items which are not partnership items; (2) assess any additional tax that would result from the requested adjustments; (3) mail to the partner a notice that all partnership items of the partner for such tax year shall be treated as nonpartnership items; or (4) conduct a partnership proceeding. *Id.* § 6227(d).

If a partnership, through its tax matters partner ("TMP"), files an AAR, the IRS may treat the AAR as a substituted return in which only clerical or mathematical errors have been corrected. *Id.* § 6227(c)(1). If the IRS decides not to treat the AAR as a substituted return, it may do one of the following: (1) without conducting a proceeding, allow or make to all partners the credits or refunds arising from the requested adjustments; (2) conduct a partnership proceeding; or (3) take no action. *Id.* § 6227(c)(2).

Section 6228 allows partnerships and partners that have filed AARs to seek further review if the IRS fails to allow part or all of the AAR. Importantly, the statute distinguishes between the type of review that may be sought. In the case of a partnership-filed AAR, the TMP may file "a petition for an adjustment" if the IRS fails to allow any part of the AAR. 26 U.S.C. § 6228(a).[2] In the case of an AAR filed by an individual partner, the partner may "begin a civil action for refund of any amount due by reason of the adjustments described" in the disallowed

---

[2] The Rigases appear to argue that the 2004 Amended Odyssey Return qualifies as a partnership-filed AAR and that the IRS failed to take appropriate action with respect to the AAR. However, even if this particular return were to qualify as an AAR, the Rigases' remedy would be limited to a petition for an adjustment. The Rigases have not filed such an action in this Court. Therefore, we are precluded from determining whether the IRS properly allowed or disallowed the adjustments requested on the 2004 Amended Odyssey Return.

AAR. *Id.* § 6228(b)(2)(A)(i).[3] Once the partner files the civil action, the partnership items listed on the disallowed AAR "shall be treated as nonpartnership items for purposes of [TEFRA]." *Id.* § 6228(b)(2)(A)(ii); *see also* 26 U.S.C. § 6231(b)(1)(B). A partner who wishes to file a civil action under § 6228(b) must do so no sooner than 6 months after the filing of the AAR and no later than two years after the AAR's filing. 26 U.S.C. § 6228(b)(2)(B)(i).

Both parties miss the central issue here. Under TEFRA, the Performance Fee and its characterization as ordinary income or capital gains are partnership items. District courts do not have jurisdiction to hear refund claims relating to partnership items unless one of two exceptions applies. *See* 26 U.S.C. § 7422(h) ("No action may be brought for a refund attributable to partnership items (as defined in section 6231(a)(3)) except as provided in section 6228(b) or section 6230(c)."). Under the exception that would be applicable here, civil actions brought under 26 U.S.C. § 6228(b), partnerships items are converted into nonpartnership items. Thus, if the Rigases properly filed under § 6228(b), the Performance Fee and its tax treatment can be addressed at the partner-level without regard to how the income is treated at the partnership-level. In other words, once the Performance Fee is considered a nonpartnership item, it is no longer subject to TEFRA's requirement that the tax treatment of partnership items be determined at the partnership level. *See Wall v. United States*, 133 F.3d 1188 (9th Cir. 1998) (once

---

[3] We do not interpret § 6228(b) as requiring a taxpayer to receive an IRS denial or notice of disallowance prior to filing a refund action. Rather, once the taxpayer has filed the AAR and the IRS has failed to allow it, the taxpayer may file suit even if the taxpayer has not yet received a formal notice of denial or disallowance. This interpretation is consistent with the language of the Code, which allows a taxpayer to file a civil action "[i]f the Secretary *fails to allow* any part of an administrative adjustment request." 26 U.S.C. § 6228(b)(2)(A); *see also Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102 (1980) (when interpreting a statute or regulation, the court must look first to the plain language of words in the statute, which must be regarded as conclusive absent a clearly expressed legislative intent to the contrary). Moreover, this reading of the Code prevents a taxpayer from running afoul of the time limits prescribed on a refund action. The Code requires a taxpayer to file a refund action no sooner than six months after filing an AAR and no later than two years after filing an AAR. 26 U.S.C. § 6228(b)(2)(B)(i). In some circumstances, such as the one presented here, the IRS may engage in lengthy review of the AAR easily lasting over two years. If the taxpayer were to be required to wait until after receiving a formal notice of denial or disallowance from the IRS before filing a refund action, the taxpayer would be time-barred by the Code from filing such a suit.

partnership items are converted into nonpartnership items, the TEFRA provisions requiring consistent treatment of partnership items no longer apply). Thus, the relevant question is whether the Rigases fall within the § 6228(b) exception. We view the arguments relating to the alleged adjustment of the Amended 2004 Odyssey Return and whether the Rigases must be treated consistently with the treatment accorded to the partnership as beside the point. It is irrelevant whether the Amended 2004 Odyssey Return triggered a partnership-level proceeding or adjusted the treatment of the Performance Fee because, once the Rigases fall within the § 6228(b) exception, they may receive different treatment, as partners, than the treatment received by Odyssey, as a partnership.

The Rigases also argue that their suit is not solely an action for a refund of a partnership item, and therefore is not subject to § 7422(h). The Rigases contend that their action is also a refund based on a claim for TEFRA consistent treatment/settlement, which is an nonpartnership item. The problem with the Rigases' argument is that the IRS never entered into a settlement agreement with any partners after the initiation of a partnership proceeding. *See* 26 U.S.C. §§ 6224(b), (c). In fact, the IRS never initiated partnership proceedings upon receipt of either Odyssey's Amended 2004 Return, the Rigases' First Amended 2004 Return, or the Rigases' Second Amended 2004 Return. At most, the IRS treated the Odyssey 2004 Amended Tax Return as a substituted return, *see id.* § 6227(c)(1), or took no action on the return. *Id.* § 6227(c)(2). In neither case did the IRS come to a settlement with some partners, and not others, whereby the Rigases would be able to bring an action for consistent treatment with the settling partners. *See Monti v. United States*, 223 F.3d 76, 77 (2d Cir. 2000) (holding that refund action based on IRS's failure to offer consistent settlement terms to nonsettling partners of a partnership is not attributable to a "partnership item" for purposes of TEFRA). Without a TEFRA settlement in

place, the Rigases cannot base their refund claim simply upon an argument for consistent treatment with the other Odyssey individual partners who received a return. The IRS is not bound to accept or allow an individual taxpayer's 1040X refund claim merely because similar refund claims by other taxpayers, or by plaintiff himself, were allowed. See *Dixon v. United States*, 381 U.S. 68, 73 (1965) ("Commissioner's acquiescence in an erroneous decision . . . cannot in and of itself, bar the United States from collecting a tax otherwise lawfully due."); *Knetsch v. United States*, 348 F.2d 932, 940 (Ct. Cl. 1965) (taxpayers not entitled to rely on tax treatment (private rulings) applicable to other taxpayer(s)); *Carpenter v. United States*, 7 Cl. Ct. 732, 740 (Ct. Cl. 1985) (IRS not bound to give one taxpayer a treatment consistent with that of another similarly situated taxpayer).

Therefore, we find that the only way the Rigases can proceed with their claim in this Court is to fall within the § 6228(b) exception. Accordingly, we examine whether either the Rigases' Form 8082 or the Rigases' Second Amended 2004 Tax Return qualifies as an AAR.

### 2.  The Rigases' Form 8082

Under Treasury Regulation 301.6227(d)-1(a), the IRS is authorized to designate a particular form to be used when a taxpayer files an AAR. *See* 26 C.F.R. § 301.6227(d)-1(a). The IRS has designated IRS Form 8802 Notice of Inconsistent Treatment or Administrative Adjustment Request. *See Samueli v. Comm'r*, 132 T.C. 336, 341-42 (2009). The uncontroverted facts show that the Rigases filed an AAR on Form 8082, though the form signed by the Rigases does not disclose when it was signed or when it was submitted to the IRS. The Government asserts in its brief that the Rigases' Form 8082 was filed approximately one month before the Rigases filed suit in this Court on November 20, 2009. The Government refers to Government Exhibit 30 as evidence for this assertion, but has not attached the exhibit to its filing. The

Rigases, however, have not contested this assertion and have accepted its truthfulness in their own brief. (Doc. No. 42 at 26.) Section 6228(b) requires a partner to wait at least six months after filing the AAR to bring a civil action.  Since the Form 8082 was filed only two months prior to the filing of suit, it is clear that the Form 8082 cannot serve as the basis for proceeding under § 6228(b). Therefore, we disregard the Rigases' Form 8082 to the extent that it serves as the jurisdictional basis for this lawsuit.[4]

### 3.  The Rigases' Second Amended 2004 Tax Return

Alternatively, the Rigases argue that their amended 2004 tax returns on Form 1040X qualify as partner AARs under the doctrine of substantial compliance. The Government contends that the substantial compliance doctrine does not apply here, and even if it did, the Rigases' amended tax returns do not substantially comply with the relevant statutory requirements.

The Fifth Circuit has recognized the doctrine of substantial compliance in certain circumstances. "Although regulatory requirements that relate to the substance or essence of a statutory provision of the Internal Revenue Code must be strictly complied with, a line of cases from the United States Tax Court has established that 'substantial compliance with regulatory requirements may suffice when such requirements are procedural and when the essential statutory purposes have been fulfilled.'" *Young v. Comm'r*, 783 F.2d 1201, 1205 (5th Cir. 1986) (quoting *American Air Filter v. Comm'r*, 81 T.C. 709, 719 (1983)). The Ninth Circuit and the Tax Court have held that substantial compliance doctrine can be used to allow an amended individual tax return unaccompanied by a Form 8082 to qualify as a partner AAR. *See Wall v. United States*, 133 F.3d 1188, 1189 (9th Cir. Cal. 1998); *Samueli v. Comm'r*, 132 T.C. 336, 343

---

[4] The Government argues that the Rigases' Form 8082 was not timely filed within three years after the 2004 Original Odyssey Return was filed. We need not address this argument. Regardless of whether the Rigases' Form 8082 was timely filed with respect to the Original 2004 Odyssey Return, it cannot serve as the basis for this refund claim under § 6228(b) because it was filed only two months before the civil action in this Court was filed. *See* 26 U.S.C. § 6228(b)(2)(B)(i).

(T.C. 2009); *but see Rothstein v. United States*, 81 AFTR 2d 2132, 98-1 USTC par. 50,435 (Fed. Cl. 1998) (rejecting argument that amended tax return qualifies as partner AAR when unaccompanied by Form 8082 because language of Treasury Regulation requiring use of particular form to file AAR is one of "strict compliance").

We also find that the doctrine of substantial compliance applies to the relevant Treasury Regulation to excuse certain deviations by a taxpayer when filing an AAR. The Treasury Regulation outlining the requirements of a valid AAR states:

> (a) In general. A request for an administrative adjustment on behalf of a partner shall be filed on the form prescribed by the Internal Revenue Service for that purpose in accordance with that form's instructions. Except as otherwise provided in that form's instructions, the request shall –
> (1) Be filed in duplicate, the original copy filed with the partner's amended income tax return (on which the partner computes the amount by which the partner's tax liability should be adjusted if the request is granted) and the other copy filed with the service center where the partnership return is filed (but, if the notice described in section 6223(a)(1) (beginning of an administrative proceeding) has already been mailed to the tax matters partner, the statement should be filed with the Internal Revenue Service office that mailed such notice);
> (2) Identify the partner and the partnership by name, address, and taxpayer identification number;
> (3) Specify the partnership taxable year to which the administrative adjustment request applies;
> (4) Relate only to partnership items; and
> (5) Relate only to one partnership and one partnership taxable year.

26 C.F.R. § 301.6227(d)-1. The regulation envisions the AAR as a way to provide substantive information to the IRS regarding the requested adjustments, and provides the use of a particular form to do so as a procedural mechanism for facilitating the delivery of this information. Moreover the IRS does not treat Form 8802 as a mandatory prerequisite to initiate an AAR. *See Prussner v. United States*, 896 F.2d 218, 224-25 (7th Cir. 1990) (substantial compliance covers situations where "the taxpayer had a good excuse (though not a legal justification) for failing to comply with either *an unimportant requirement* or one unclearly or confusingly stated in the

regulations or the statute." (emphasis added)). In correspondence written by a TEFRA technical advisor at the IRS, he states "[i]f the partner does not attach a Form 8082 to his or her Form 1040X, but provides substantially the same information, Counsel usually has us treat it as an informal AAR." (Doc. No. 42 Ex. 11 at 19.) Another email from a different TEFRA technical advisor refers to the Rigases' failure to file a Form 8082 with their amended return as a "procedural ground to disallow the claim." (*Id.* at 14.) From these exchanges we can glean that the IRS's practical view on Form 8082 is that it a procedural, rather than a substantive, requirement.

The Government cites several cases in support of its argument that Treasury Regulation § 301.6227(d)-1's requirement of a specific form imposes a substantive requirement that cannot be waived through the doctrine of substantial compliance. However, all of the cases cited relate to administrative exhaustion under 26 U.S.C. § 7422(a), which requires a taxpayer to file a refund claim with the IRS prior to filing a refund suit in court. Moreover, in one of the cases cited, the Seventh Circuit recognizes that, "while the Treasury may not waive the congressionally mandated requirement that a claim be filed, the Treasury can waive its own formal requirements." *Kikalos v. United States*, 479 F.3d 522, 525 (7th Cir. Ind. 2007). We interpret Treasury Regulation § 301.6227(d)-1 as imposing the substantive requirement that certain information be filed with the IRS in order to initiate an AAR, but that Form 8802 is a formal requirement that can and has been waived on occasion by the IRS. We join the Ninth Circuit and the Tax Court in finding that a taxpayer's failure to file a Form 8082 along with his amended tax return can be excused under the substantial compliance doctrine.

We turn next to the question of what a taxpayer must do in order to substantially comply with the regulation. The Fifth Circuit has held that "substantial compliance is achieved where the

regulatory requirement at issue is unclear and a reasonable taxpayer acting in good faith and exercising due diligence nevertheless fails to meet it." *Estate of McAlpine v. Comm'r*, 968 F.2d 459, 462 (5th Cir. 1992) (citing *Prussner*, 896 F.2d at 224-25).

The Second Amended 2004 Rigas Return complies with the Treasury Regulation by identifying the individual partner (John Rigas), the partnership (Odyssey), their addresses, and their taxpayer identification numbers.[5] In addition, the return relates to one partnership taxable year and identifies that year as 2004. Finally, the return provides the following explanation of the changes to income, deduction, and credits being made:

> Taxpayers received Amended K-1s from Odyssey Energy Capital I LP and from Odyssey Energy Capital LLC after their original return was filed. This amended return reflects the amended information. All documentation to support the calculations is enclosed. The information includes the amended K-1s and the effected forms and schedules which include Form 1040 pages 1 and 2, Forms 4797, 6251, and 8582 and Schedules D, E and SE.

(Doc. No. 32 Ex. 28 at 7.)

However, the Second Amended 2004 Rigas Return departs from the Treasury Regulation in the following ways. First, the Second Amended 2004 Rigas Return related to more than one partnership. Second, the Second Amended 2004 Rigas Return includes amendments not only to partnership items (i.e. the income received from Hydrocarbon via Odyssey), but also amendments to non-partnership items such as credits. (Doc. No. 32 Ex. 28 at 1; *compare* Doc. No. 32 Ex. 28 at 18, l. 54 *with* Doc. No. 32 Ex. 25 at 2, l. 54.) Finally, the Second Amended Rigas Return was not filed in Odgen, Utah, where counsel for the parties represented that the Amended 2004 Odyssey Return had been filed.

---

[5] We need not examine whether the First Amended 2004 Rigas Return, which was filed in April 2007, can be considered a partner AAR. Even if the First Amended 2004 Rigas Return qualifies as a partner AAR, the Rigases would be barred from proceeding under § 6228(b) because they filed suit in this Court over two years after it was filed.

Despite these deficiencies, we find that the Second Amended 2004 Rigas Return substantially complied with requirements of an AAR imposed by Treasury Regulation § 301.6227(d)-1. Although the Second Amended 2004 Rigas Return departed in certain ways from the regulatory requirements, it provided the key information needed by the IRS to realize that the Rigases were requesting an adjustment of a partnership item. It provided information about Odyssey, the tax year to be adjusted, and the partnership item to be adjusted. The inclusion of a request for adjustment relating to another partnership was clearly described in the document so that the IRS would understand that two different partnership K-1s were at issue. Finally, the Rigases intended to adjust a partnership item by filing the Second Amended 2004 Rigas Return, after several attempts to obtain an adjustment and filing what they believed was the necessary paperwork to do so. (Rigas Dep. 27:21-28:6; Wilkinson Dep. 56:14-18, 59:25-60:18, 60:19-23.) In sum, we find that the Second Amended 2004 Rigas Return qualifies as an AAR under the doctrine of substantial compliance. As such, the Rigases' may bring a claim for a tax refund under § 7422 because their claim falls within the § 6228(b) exception of § 7422(h).

### B. Partnership Relationship Between Odyssey and Hydrocarbon

Both parties have moved for summary judgment on the partnership relationship between Odyssey and Hydrocarbon. The Rigases argue that Odyssey and Hydrocarbon were engaged in a joint venture or partnership,[6] while the Government argues that they were engaged merely in a service relationship. As an initial matter, there do not appear to be any genuine issues of material fact to be resolved. Both parties have submitted tax documents, deposition testimony, and IRS materials. Neither party has contested factual assertions made in these documents. The parties'

---

[6] The Rigases use the terms "partnership" and "joint venture" interchangeably. "Whether or not a joint venture exists for tax purposes is determined by applying the same tests used in determining the existence of a partnership." *See Wheeler v. Comm'r*, T.C. Memo 1978-208, *22 (T.C. 1978); *see also Allison v. Comm'r*, T.C. Memo 1976-248, *27 (T.C. 1976). Thus, we treat the relevant inquiry as one into partnership between Odyssey and Hydrocarbon.

dispute ultimately centers on whether, drawing upon the facts presented, a partnership existed between Odyssey and Hydrocarbon. Since no facts are in dispute, we can resolve this issue at the summary judgment stage.

To determine whether a partnership exists for purposes of federal tax law, courts look to federal law. *See* 26 U.S.C. §§ 761(a), 7701(a)(2).[7] Partners may contribute capital, services, or both to a partnership. *Culbertson*, 337 U.S. 733, 740 (1949). To determine whether a partnership exists, a court must engage in a factual inquiry as to whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise."[8] *Culbertson*, 337 U.S. at 742; *see also Spector v. Commissioner*, 641 F.2d 376, 381 (5th Cir. 1981). Several courts have emphasized that the focus in the partnership inquiry is upon the intent of the parties, not upon the form of the venture. *See, e.g.*, *Estate of Smith v. Comm'r*, 313 F.3d 724, 730 (8th Cir. 1963); *Wheeler v. Comm'r*, 37 T.C.M. (CCF) 883 (T.C. 1978) ["[T]he single most important consideration is the parties' intent to enter into a joint venture."). In determining intent, a court looks at the following factors, none of which is conclusive:

> The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account

---

[7] A partnership, as defined by the Internal Revenue Code (the "Code"), "includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization." 26 U.S.C. § 7701(a)(2).

[8] *Culbertson* identified the following facts as potentially relevant to this inquiry: "the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent." 337 U.S. at 742.

were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

*Luna v. Comm'r*, 42 T.C. 1067, 1078 (T.C. 1964). We review these factors below.

### 1. Agreement of the Parties

Several courts have recognized that, despite the existence of an agreement that specifically disclaims a joint venture or partnership, the underlying nature of the relationship between the parties can give rise to the creation of a partnership. *See Hirsch v. Comm'r*, T.C. Memo 1983-371, *22 (T.C. 1983); *Jensen v. Comm'r*, T.C. Memo 1980-335, *10 (T.C. 1980). As the Fifth Circuit stated in *Haley v. Comm'r*, 203 F.3d 815 (5th Cir. 1953), "even though it was expressly stated that the parties did not intend to enter into a joint venture or partnership, if the agreements and the conduct of the parties thereunder plainly show the existence of such relationship, and the intent to enter into it, it will nevertheless be held to exist for tax purposes." *Id.* at 818. Consistent with this principle, courts have held both that partnerships have existed despite written agreements disclaiming partnership or venture relationship, *see Jensen*, T.C. Memo 1983-371, *Hirsch*, T.C. Memo 1983-371, and that partnerships have not existed when the conduct of the parties was consistent with the employment relationship set forth in the written agreement. *See Kessler v. Comm'r*, T.C. Memo 1982-432 (T.C. 1982); *Luna*, 42 T.C. 1067.

Here the Management Agreement explicitly disclaimed the existence of a partnership relationship between Odyssey and Hydrocarbon. Moreover, the Management Agreement expressly characterized Odyssey as an independent contractor and the Performance Fee as compensation for services rendered. Since no one from Hydrocarbon has provided affidavits or testimony regarding Hydrocarbon's intent, we must assume that the Management Agreement is reflective of their true intent. *See Kessler*, T.C. Memo 1982-432. Indeed, an email from David

Roberts, an Odyssey limited partner, references Hydrocarbon's desire to avoid partnership with Odyssey.

Odyssey argues that, despite the text of the Management Agreement, its intent to form a partnership is evidenced in a number of ways. First, Roberts' email describes Odyssey's willingness to invest $500,000 in the asset portfolio in order to take advantage of capital gains treatment on its 20% interest, thereby documenting Odyssey's intent to form a partnership. (Stewart Dep. 86:18-23.) Second, Odyssey executed the Promissory Note, whereby it would pay all the overhead expenses of the venture. (Stewart Dep. 94:24-95:5.) Finally, Rigas and Stewart both testified to their intent form a partnership with Hydrocarbon. Rigas stated, "I don't think we, specifically, went around discussing whether we were in a partnership with Hydrocarbon or not. We knew what our arrangement with Hydrocarbon was. So, I don't know if I recall say, 'Hey, you know, this is our partnership with Hydrocarbon' . . . No we understood that we were in a—you know, in a partnership with respect to how we dealt with the assets and the things that we were managing with the folks at Hydrocarbon." (Rigas Dep. 23:5-18.) Stewart testified that Odyssey's "intent was to essentially work in a partnership" with Hydrocarbon managing the assets. (Stewart Dep. 24:4-5.) Hydrocarbon did not become a partner in Odyssey because the Hydrocarbon's asset purchase from Mirant was so rushed as to leave little time to negotiate the agreements between Hydrocarbon and Odyssey. (Stewart Dep. 26:9-24.)

The text of the Management Agreement is unambiguous with respect to the relationship that was formally created between the parties. However, since the conduct of the parties may establish that the parties were actually engaged in a partnership, we will not treat the Management Agreement's language as dispositive of the partnership relationship.

### 2.   Contributions of the Parties to the Venture

Odyssey argues that it made contributions to the venture in the form of capital and services. With respect to capital contributions, Odyssey first contends that it contributed funds for overhead expenses through its draw downs on the Promissory Note. (Stewart Dep. 46:10-12.) Second, Odyssey purchased a working interest in an ExxonMobil lease for $130,000. (Stewart Dep. 45:1-7.) The $130,000 came from funds that Odyssey obtained from the Promissory Note. (Stewart Dep. 45:13-16.) We find that these types of transactions were contributions to capital made by Odyssey. Although both sets of transactions were initially funded by Hydrocarbon through the Promissory Note, Odyssey later bore the cost of these transactions. According to the method by which the Performance Fee was calculated, Hydrocarbon would have to receive full payment of the loans expended under the Promissory Note before Odyssey would receive a Performance Fee. In other words, Odyssey's Performance Fee was reduced by the amount needed to pay off the Promissory Note. If Odyssey had not been required to pay off the Promissory Note, its Performance Fee would have been greater. We thus characterize these reductions of Odyssey's Promissory Note as capital contributions, where the contribution is deferred until the liquidation of the partnership.

Third, Odyssey used its own funds to buy furniture and fixtures for the office. (Stewart Dep. 46:13-20.) These start-up costs were not paid for through the Promissory Note and were not reimbursed by Hydrocarbon. (Stewart Dep. 46:18-20.) Thus, they are capital contributions made by Odyssey to the venture.

With respect to contributions in the form of services, it is clear that Odyssey possessed the "know-how" or expertise needed to manage the assets. Plato testified that all of the entities interested in purchasing the asset portfolio from Mirant were interested in keeping on the Odyssey limited partners to manage the assets due to the bidders' lack of experience doing so.

(Plato Dep. 12:18-21.) Stewart testified that Odyssey provided advice to Hydrocarbon in investing an additional $75 million into the asset portfolio after it was purchased from Mirant. (Stewart Dep. 27:15-25.) Because Hydrocarbon had no experience in managing oil and gas investments, Hydrocarbon relied on Odyssey's evaluation, judgment and experience to ensure that the $75 million was invested appropriately. (*Id.*) Such contributions of "know-how" or expertise have been characterized as contributions by a partner, as opposed to an employee. *See Jensen*, T.C. Memo 1980-335 at *13; *Wheeler*, T.C. Memo at 1978-208 at *12.

In addition, the Odyssey partners took an approximately 50% pay cut from the industry-standard salaries and bonus packages that they would have received if they worked as employees doing investment management. (Stewart Dep. 46:20-47:4, 48:21.) We do not view these as capital contributions, but believe that they are more appropriately characterized as contributions in the form of services.

In sum, we find that Odyssey contributed both capital and services to the relationship with Hydrocarbon.

### 3.   Interest in Profits and Losses

Another key issue is the extent to which the parties share the profits and loss of the venture. *Culbertson* relied in large part upon the test set forth in *Commissioner v. Tower*, 327 U.S. 280 (1946), which held that a partnership is determined by resolving "whether the partners really and truly intended to join together for the purpose of carrying on business *and sharing in the profits or losses or both*." *Id.* at 287 (emphasis added.) *Culbertson* adopted *Tower*'s focus on the intent of the parties to join together in carrying out a business, but did not adopt *Tower*'s additional requirement that parties share in the partnership's profits, losses, or both. However,

several courts have continued to emphasize the significance of the parties' sharing of profits or losses, and the particular form that takes, within the overall factual inquiry into intent.

With respect to sharing of profits, courts are split on whether this signals a partnership or whether it is merely a way in which compensation for services is measured. In *Podell v. Comm'r*, 55 T.C. 429 (T.C. 1970), the court found a partnership in a real estate development venture where the parties agreed to split the profits and losses of the venture. *See also Jensen*, T.C. Memo 1980-335. In contrast, in *Kessler v. Comm'r*, T.C. Memo 1982-432 (T.C. 1982), the court did not find a partnership in a real estate deal where an individual agreed to be paid 15% of profits in exchange for his management services. The court believed the 15% fee to be "contingent compensation" that was similar to "typical employment or independent contractor relationships which are relatively common among lawyers and brokers. Under such circumstances, merely providing for compensation to be measured by reference to profits to be derived from the sale of property does not convert the relationship to a partnership for Federal Tax purposes." *Id.* at *20. However, the court also noted that the 15% of profits that Kessler received was in lieu of any other compensation for the services rendered, suggesting that the 15% was the compensation for his services. *Id.* at *21; *but see* Revenue Ruling 54-84 (finding partnership in oil and gas investment venture where one party received no compensation except its share of profits). Here Odyssey received a 20% share of the profits generated by the asset portfolio. If the asset portfolio performed well, the 20% share would be the only compensation Odyssey received for its services, because the salaries Odyssey had previously received under the Promissory Note would have been first paid back to Hydrocarbon. However, if the asset portfolio performed poorly, the only compensation to Odyssey would have been the salaries paid out under the Promissory Note. In either case, Odyssey would receive only one form of

compensation for its services. This arrangement distinguishes the case presented from the cases in which partners who contribute "know how" or "expertise" receive a stipend or salary for their services in addition to the profit interest. *See Jensen*, T.C. Memo 1980-335 at *5-*6; *Wheeler*, T.C. Memo 1978-208 at *4.

More dispositive of a partnership relationship is the presence of loss sharing among the partners. In *Estate of Smith*, the Eighth Circuit addressed a situation where an investment firm that contended it was partners with individual investors possessing trading accounts at the firm. The firm split the profits of trading accounts with the individual investors. However, only under unusual circumstances, would the firm be required to cover losses to the trading accounts. Rather, the individual investors would be liable to the extent of their investment to cover losses. The Eighth Circuit found that "such limited assumption of liability would not conclusively establish a partnership or negative the existence of an employment contract." 313 F.3d at 732. Several other courts have also found that, where one party bears all of the loss in a relationship, no partnership exists. *See Duley*, T.C. Memo 1981-426 at *32 (no partnership was formed where one individual put up all the capital and agreed to split profits with the other, but the latter did not share losses); *Kessler*, T.C. Memo 1982-432 at *21 (property manager paid via profits interest but not required to share in losses resulting from the property); *Luna*, 42 T.C. at 1078 (insurance salesman's compensation was measured in relationship to profits, but he did not share losses on insurance policies).

Yet a few courts have found partnerships where losses were not shared by all the partners. In both *Jensen* and *Wheeler*, one partner put up the money to purchase properties, while the other partner carried out management and development duties on the properties in exchange for a percentage of the profits realized on the properties. The courts in these cases clearly

recognized that the partner with management and development duties did not bear any losses if the venture did not succeed. However, in both cases, the courts found that a partnership had been created. *Jensen*, T.C. Memo 1980-335 at *12; *Wheeler*, T.C. Memo 1978-208 at *25-*27.

Odyssey claims here that it shared losses with Hydrocarbon in two major ways. First, Odyssey argues that, if the venture did not make any profits, it would be required to pay back the salaries and overhead expenses obtained via the Promissory Note or, if Hydrocarbon cancelled the amount owing on the Promissory Note, Odyssey would bear tax liability for discharge of indebtedness income.[9] The Government argues that the Promissory Note was nonrecourse as to Odyssey and its limited partners in the event that the revenue from the assets could not cover repayment of the Promissory Note.

The Promissory Note created a nonrecourse obligation that Odyssey was not required to repay to Hydrocarbon if the asset portfolio proved unprofitable. The Promissory Note states in clear terms that repayment was limited to "the amount and right to receive the Performance Fee" and, should the amount be insufficient to pay Odyssey's obligations under the Promissory Note, Hydrocarbon waived its rights to a deficiency claim on account of such liability and would cancel the Promissory Note. In addition, the Promissory Note stated that "no recourse for payment of the obligations" of the Promissory Note would be had by Hydrocarbon against Odyssey or its individual partners. Finally, Odyssey did not put up any collateral for the Promissory Note. The Promissory Note did not confer any risks upon Odyssey if the assets that were the subject of the partnership relationship did not perform well.

---

[9] The Rigases also argue that they shared risk of loss by agreeing to accept a much-reduced salary as compensation during the period before the asset portfolio was sold. Courts have not looked favorably on the concept of construing absence of compensation as a loss. In *Kessler*, the individual who was to be paid 15% of profits in the event of a profitable deal would not receive any compensation if the property was not sold for a profit or was sold for a loss. T.C. Memo 1982-432 at *19. The court did not view this arrangement as true loss sharing. *Id.* at *21. However, receiving "wholly inadequate" compensation for services can be seen as evidence of a partnership relationship. *See Cobb*, 185 F.2d at 257.

The Rigases next rely on *Comm'r v. Tufts*, 461 U.S. 300 (1983), to contend that cancellation of nonrecourse debt would constitute discharge of indebtedness income or "skin in the game." In *Tufts*, the Supreme Court held that a taxpayer who sold property encumbered by a nonrecourse mortgage exceeding the fair market value of the property must include the unpaid balance of the mortgage in the computation of the amount the taxpayer realized on the sale under 26 U.S.C. § 61(a)(3). However, "[t]here is a distinction between what constitutes income realized from the 'discharge of indebtedness' under § 61(a)(12) and income realized from 'gains derived from dealing in property' under § 61(a)(3)." *2925 Briarpark, Ltd. v. Comm'r*, 163 F.3d 313, 317-18 (5th Cir. 1999). Section 61(a)(12) provides that a debtor may realize discharge of indebtedness income where his debt is canceled, forgiven or otherwise discharged for less than the full amount. When a nonrecourse debt is forgiven, the debtor's basis in security the property is reduced by the amount of debt canceled, and realization of income is deferred until the sale of the property. *United States v. Kirby Lumber Co.*, 284 U.S. 1 (1931). "This interpretation attributes income only when assets are freed, therefore, an insolvent debtor realizes income just to the extent his assets exceed his liabilities after the cancellation." *2925 Briarpark*, 163 F.3d at 318 (citing *Tufts*, 461 U.S. at 310 n.11). In contrast, § 61(a)(3) applies when a taxpayer agrees to surrender the property in exchange for the cancellation of the debt. *2925 Briarpark*, 163 F.3d at 318. Here, the Promissory Note did not contemplate that Odyssey would surrender any property in the event that the Promissory Note was cancelled. Therefore, Odyssey's cancellation of indebtedness income would not have fallen under § 61(a)(3) as a gain derived from dealing in property.

Second, Odyssey argues that the "clawback provision" acted to create an obligation to share losses. The clawback provision provided that, after the distribution of the 20% and 80% of

income, Hydrocarbon could ask Odyssey to repay some of its 20% income if subsequent expenses or losses on the assets came to light. Odyssey, in fact, did pay approximately $30,000 to Hydrocarbon pursuant to the clawback provision. Stewart stated that, if back-end expenses exceeded the profits distributed to Hydrocarbon and Odyssey, "everybody had to pay back part of their ownership interest to the assets." (Stewart Dep. 62:22-23.) Stewart viewed this as a defining characteristic of the partnership—i.e., that Odyssey had to participate, good or bad, in the performance of the assets. (Stewart Dep. 62:24-63:1.) In contrast, when Stewart worked as an employee at Mirant, he was never required to pay back his bonus. (Stewart Dep. 63:2-3.) The clawback arrangement is indicative of a partnership arrangement. In *Wheeler*, a partner did not share in any losses if the venture was unprofitable, but was required to absorb losses if the venture succeeded. T.C. Memo 1978-208 at *26-*27.

Finally, the subordination of the profits interest to Hydrocarbon's recovery of its expenses and initial investment can be indicative of a partnership relationship, though it is equally consistent with a theory that Odyssey was a service provider to be rewarded with a percentage of the profits. *Compare Wheeler*, T.C. Memo 1978-208 at *28 (profit sharing arrangement whereby capital investor was reimbursed for invested capital first was not adverse to finding of partnership relationship) *with Kahn v. Comm'r*, 499 F.2d 1186, 1190 (2d Cir. 1974) (a contingent profits interest that was subordinated to capital owner's expenses in purchasing and liquidating assets was fee for services).

### 4.  Responsibilities of the Parties

Courts have emphasized the level of control and responsibilities that a putative partner exercises over the business venture's affairs when considering whether the individual is truly a partner. In *Wheeler v. Commissioner*, T.C. Memo 1978-208 (T.C. 1978), the Tax Court found a

partnership relationship to exist between Wheeler and another individual who engaged in a joint venture for real development. The partner provided front money for the real estate projects, while Wheeler carried them through the financing, construction and occupancy phases. As the Tax Court put it, "[t]he association between [Wheeler] and [the partner] was a marriage of capital and know-how." *Id.* at *5. The Tax Court found a partnership in part due to the actual conduct of the parties. Wheeler exercised authority on a day-to-day basis by selecting subcontractors, signing subcontracts, approving payrolls, approving interim payments to subcontractors, approving payments for materials, approving change orders in construction, and negotiation commitments. *Id.* at *25. In addition, Wheeler could sign checks on the bank account of the venture. *Id.* at *26.

Other courts have also found that an individual's contribution of substantial time and day-to-day management of an investment, such as a business or real estate development, can contribute to a finding of a partnership. *See Jensen*, T.C. Memo 1980-335 at *12; *Cobb v. Comm'r*, 185 F.2d 255, 257-59 (6th Cir. 1950) (wife was partner in husband's business in part due to her management of business's operations and books in exchange for "wholly inadequate" compensation). In a revenue ruling, the IRS found a partnership to exist in an oil and gas development venture where one party contributed all the income and bore all the loss, but where the other parties were authorized to "acquire oil and gas leases, to make contracts and commitments for the drilling of wells for oil an gas, and otherwise development the property." Revenue Ruling 54-84 (1954). What appears clear from these cases is that the putative partner possesses legal authority in significant matters that would bind the partnership, such as signing authority on bank accounts, the authority to enter into contracts, and to make business decisions affecting the capital of the venture without direct oversight from the other partner.

Odyssey possessed a great deal of autonomy in managing the day-to-day operations of the asset portfolio with Hydrocarbon. Stewart described Odyssey's duties as involving engineering analysis, title work for the assets, structuring hedging agreements, managing loan agreements, servicing collateral bank accounts, making deposits in the bank accounts, preparing end-of-month, performance, and financial reports, preparing loan disbursement requests, and negotiating the exit from transactions. (Stewart Dep. 35:19-36:19.) Regarding disbursement requests, Odyssey made recommendations to Hydrocarbon for the actual disbursement. (Stewart Dep. 36:10-11.) Stewart also testified that Odyssey carried out more tasks than those set out in the Management Agreement. Odyssey planned all of the operating expenses of the venture and invested in a capital asset. (Stewart Dep. 32:13-17.) Prior to receiving written approval from Hydrocarbon, Odyssey often represented that it had the authority to dispose of an asset. (Stewart Dep. 57:19-58:11.) Stewart described the relationship as one of "good business partners" who would make a decision together. (Stewart Dep. 52:3-4.) Plato testified that he monitored the portfolio's investments, including valuing the performance of the portfolio companies in relation to their development plans, deciding where wells should be drilled, whether to advance more capital to the companies. (Plato Dep. 13:19-14:12.) Odyssey did not need to obtain approval from Hydrocarbon in order to approve a portfolio company's decision to drill wells as long as it was within the portfolio company's budget. (Plato Dep. 14:21-15:14.) However, Odyssey needed to get Hydrocarbon's approval in order to increase the capital commitment to a portfolio company. (Plato Dep. 15:22-16:4.) Rigas describes having done more than simply the duties outlined in the Management Agreement in order to "protect the investment in these assets, both the investments that Hydrocarbon made and the investments that we were making in these

assets." (Rigas Dep. 19:17-19.) One example included Odyssey's purchase of a lease from ExxonMobile to perfect title to an asset. (Rigas Dep. 19:22-24.)

Despite the great deal of responsibility Odyssey exercised over the asset portfolio, Odyssey did not have authority to withdraw funds from Hydrocarbon's bank accounts, could not increase Hydrocarbon's capital commitment to a particular asset, could not enter into binding agreements in Hydrocarbon's name, and could not dispose of an asset without Hydrocarbon's prior written approval. Odyssey's responsibilities, while numerous, did not extend into the key areas of acquiring and disposing of assets or drawing upon Hydrocarbon's bank accounts that would indicate a partnership relationship.

### 5. Parties' Right to and Control over Income and Capital

Where the putative partner does not possess an ownership interest in capital, title to the assets of the partnership, or no practical ability to control the assets, a partnership is unlikely to exist. *See Kahn*, 499 F.2d at 1190; *Kessler*, T.C. Memo 1982-432 at *21. In *Wheeler*, however, the Tax Court found that the lack of the incidents of control over partnership capital did not defeat a finding of a joint venture:

> To be sure, there are factors in the agreement which tend to indicate the relationship between the parties was not that of a joint venture. Title to the properties was held solely in Perrault's name. Cumulative losses of the venture were to be borne solely by Perrault. Petitioner could not borrow or lend money on behalf of the venture, execute a security instrument, release any debt or claim except upon payment in full, compromise or submit to arbitration any controversy involving the venture or to sell, assign, pledge, or mortgage his net profits interest in the venture. However, these restrictions on petitioner's authority were merely protection for Perrault's capital advances, and characteristics such as Perrault's holding title to properties or bearing all the losses have been specifically recognized as the respondent as insufficient to negate the existence of a joint venture.

*Wheeler*, T.C. Memo 1978-208 at 29-30 (citing Rev. Rul. 54-84, 1954-1 C.B. 284); *see also Jensen*, T.C. Memo 1980-335 (partnership existed even where management partner did not own title in the real estate that constituted partnership's assets).

Here, we view Odyssey's relationship to Hydrocarbon in much the same light as the courts in *Kahn* and *Kessler*. Odyssey did not own title to any of the assets in the portfolio, not even the ExxonMobil interest it purchased with $134,000 of funds taken from the Promissory Note. Apart from depositing checks, Odyssey did not share control with Hydrocarbon over the bank accounts that corresponded with the companies in the asset portfolio. Odyssey could only make recommendations to Hydrocarbon, upon which Hydrocarbon relied, to disburse funds from the accounts. (Stewart Dep. 82:5-83:3.) Odyssey's relationship to the asset portfolio, while bearing some similarities to the *Wheeler* and *Jensen* cases, did not include any control over the venture's business income like the *Wheeler* and *Jensen* partners did. Thus, we find Odyssey's right to and control over the assets and income of the venture as indicative of a service provider relationship.

### 6. Representation to IRS and Third-Parties, Separate Books, Parties' Agency Relationship, and Business conducted in the Joint Name of the Partnership

Courts also focus on the way that the parties represent themselves to third-parties and governmental authorities. In *Kessler*, the court did not find a partnership in part because neither of the putative partners filed partnership returns for the relevant taxable years. T.C. Memo 1982-432 at *20-*21. The case of *Wheeler* involved a partner who owned the real estate and Wheeler, who conducted management and development of the properties. When the properties were sold, and profits were shared between the partner and Wheeler, the partner did not deduct Wheeler's profit share on his tax return as compensation paid to a service provider. T.C. Memo 1978-208 at

34

*8, *27. Rather, the profit reported on the partner's tax return was the gain on the sale of the real estate reduced by Wheeler's profit share. *Id.*; *see also Jensen*, T.C. Memo 1980-335 (monthly allowance given to management partner were capitalized as a cost of acquiring and developing property rather than expenses). It may also be important whether the company providing the profit share reports that income on a Form W-2 or Form 1099-MISC, withholds taxes, or provides benefits as it would to employees. *See Holdner*, T.C. Memo 2010-175 at *30; *Jensen*, T.C. Memo 1980-335 at *15.

Here Odyssey and Hydrocarbon did not file joint tax returns or joint financial reports with governmental authorities. (Plato Dep. 9:23-25; 10:1-3.)  We also have no evidence as to the type of tax return filed by Hydrocarbon in relevant tax years nor how Hydrocarbon reported the 20% profit share paid to Odyssey.  Odyssey did not receive Forms K-1 from Hydrocarbon. (Wilkinson Dep. 33:21-23.) On the other hand, it appears that Odyssey did not receive Forms W-2 or 1099-MISC from Hydrocarbon.

As for how Odyssey represented itself to third-parties, Rigas testified that he never told anyone that Odyssey owned the assets in the portfolio. (Rigas Dep. 18:11-15.) On the other hand, Rigas told the portfolio companies that he could dispose of assets and did not disclose the limitation on his authority contained in the Management Agreement. (Rigas Dep. 21:7-25.) Stewart testified that neither he nor any of the other Odyssey partners represented to third-parties that they owned the asset portfolio. (Stewart Dep. 43:22-44:4.) In addition, Odyssey and Hydrocarbon had separate checking accounts.

These factors do not establish a partnership relationship existed between Odyssey and Hydrocarbon. Rather, these factors indicate that Odyssey and Hydrocarbon maintained separate accounting and financial arrangements. Odyssey was mindful of the distinction between itself

and Hydrocarbon in its representations to third-parties. These facts tilt towards a finding that Odyssey was a service provider rather than a partner with Hydrocarbon.

After considering all of the factors indicative of the entities' intent to form a partnership, we must hold that the Government has established by a preponderance of the evidence that a partnership relationship did not exist between Odyssey and Hydrocarbon. On one hand, there are some indications that a partnership relationship existed, including the marriage of capital and "know how," Odyssey's contributions to overhead expenses, and Odyssey's payment under the "clawback" provision of the Management Agreement. On the other hand, many more aspects of the relationship indicate that it was one of services provided in exchange for a fee based on a percentage of profits, rather than a partnership involving a profits interest. The Performance Fee was to be the only compensation Odyssey received for its services, unlike the "know how" partners in *Wheeler* and *Jensen*. Odyssey did not bear any losses of the venture—if the asset portfolio performed poorly, Odyssey did not have to pay back sums obtained under the Promissory Note. The reduction in pay that the Odyssey individual partners assumed while working on the venture is not unlike a contingency fee arrangement. Odyssey's day-to-day responsibilities and its right to and control over the assets shows that Odyssey could not dispose or acquire assets, could not make significant business decisions, and could not withdraw funds from Hydrocarbon's account without Hydrocarbon's approval. Finally, the Management Agreement explicitly stated that the parties had not entered into a joint venture or partnership. These facts establish that no partnership relationship existed between Hydrocarbon and Odyssey. As such, we must deny the Rigases' motion for summary judgment and grant the Government's motion for summary judgment on this ground.

## V.     CONCLUSION

Plaintiffs' Motion to Shift the Burden of Proof (Doc. No. 30) is **GRANTED**. Plaintiffs' Motion for Summary Judgment (Doc. No. 38) is **DENIED**. Defendant's Motion for Summary Judgment (Doc. No. 32) is **GRANTED**.

**IT IS SO ORDERED**.

**SIGNED** in Houston, Texas this the 2nd day of May, 2011.


_____

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE